2012 UT 49

**COMMERCIAL REAL ESTATE INVESTMENT, L.C., Plaintiff and Appellee,**

v.

**COMCAST OF UTAH II, INC., Defendant and Appellant.**

No. 20090847.

Supreme Court of Utah.

Aug. 10, 2012.

Richard W. Jones, Keith M. Backman, Ogden, for plaintiff.

Anthony C. Kaye, Matthew L. Moncur, Salt Lake City, for defendant.

Justice DURHAM, opinion of the Court:

## INTRODUCTION

¶ 1 Comcast of Utah II, Inc. (Comcast) appeals from the district court's grant of partial summary judgment in favor of Commercial Real Estate Investment, L.C. (CRE). The district court awarded CRE approximately $1.7 million in liquidated damages, plus approximately $2 million in interest, based on Comcast's breach of contract. On

appeal, Comcast challenges the enforceability of the liquidated damages clause in its contract with CRE. The parties dispute what law governs review of the enforceability of liquidated damages clauses. We hold that liquidated damages clauses are not subject to heightened judicial scrutiny, but instead are treated like any other contractual provision. We reject Comcast's argument that the liquidated damages clause in this contract is unconscionable and further conclude that CRE did not breach its duty to mitigate its damages. We accordingly affirm.

## BACKGROUND

¶ 2 This recitation of facts is based on the district court's undisputed findings of fact for purposes of summary judgment. In 1995, TCI Cablevision of Utah (TCI) approached CRE about "developing a large commercial building where TCI could operate its northern Utah cable television business." TCI proposed to locate a suitable site and design a building to meet its specific needs. CRE would purchase the site and construct the building to TCI's specifications. TCI further proposed to enter into a long-term lease for the building.

¶ 3 TCI identified a suitable site in Riverdale, Utah. The site was located in a commercial/industrial subdivision that was largely undeveloped. CRE agreed with the proposed site. CRE anticipated that this new building might drive additional development in the subdivision, and consequently acquired another lot adjacent to the TCI lot. But "CRE did not express its intentions regarding adjacent development to TCI."

¶ 4 TCI's agent prepared the lease and delivered it to CRE. The lease as drafted by TCI's agent contained blanks for the rental amounts and the term of the lease. CRE approved the lease as presented: "The only additions [to the lease] were that the rental amounts and the term had been added. In all other respects, the final lease contained the same provisions as TCI's draft lease."

¶ 5 The lease contained the following provisions regarding the tenant's duties to continuously operate the building:

9.01 *Tenant's Business Operations.* Tenant covenants to operate all of the Building continuously during the entire term of this Lease with due diligence and efficiency unless prevented from doing so by causes beyond Tenant's control. Tenant shall keep on the Building at all times sufficient personnel to service the usual and ordinary demands and requirements of its customers. Tenant shall conduct its business on the Building during the regular customary days and hours for such type of business in the city or trade area in which the Building is located.

9.02 *Liquidated Damages.* As liquidated damages for the failure of Tenant to comply with the terms of this Article and in addition to all other remedies Landlord may have hereunder, Landlord shall have the right, at its option, to collect not only the minimum and additional rent herein provided, but added rent at the rate of one-thirtieth (1/30th) of the minimum monthly rent set forth in Article 4 for each and every day that Tenant shall fails [*sic*] to conduct its business as required herein.

The lease further specified that CRE had a duty to "exercise its reasonable best faith efforts to mitigate its damages, if any, arising from" a violation of the above provisions.

¶ 6 The parties signed the lease agreement in July 1995. TCI thereafter took possession and began operating its business from the building. On July 17, 2001, however, TCI ceased operations at the building and vacated the premises. In 2002, Comcast acquired TCI and succeeded to TCI's interest in the property and to its obligations under the terms of the lease. Sometime thereafter, "Comcast listed the building with a realtor in an effort to locate a replacement tenant." "CRE referred any inquiries regarding the property to Comcast's real estate agent, but CRE made no other efforts to find a substitute tenant." A substitute tenant took possession of the property on February 22, 2006.

¶ 7 TCI (and subsequently Comcast) paid all rent due under the lease since July 1995, but have refused to pay any liquidated damages pursuant to Article 9 of the lease. Not counting interest, liquidated damages from

July 17, 2001, to February 22, 2006, total $1,711,990.66.

¶ 8 In July 2004, CRE sued Comcast for breach of contract and attorney fees. Both parties filed motions for partial summary judgment as to the enforceability of the liquidated damages provision. The parties strongly disagreed as to which case law the district court should apply to determine the clause's validity. CRE argued that enforceability depended only on whether the clause is unconscionable. Comcast countered that enforceability should be determined under section 339 of the first Restatement of Contracts. Both parties supported their respective positions with extensive case law.

¶ 9 The district court granted CRE's motion for partial summary judgment. The district court first held that our decision in *Reliance Insurance Co. v. Utah Department of Transportation*, 858 P.2d 1363 (Utah 1993), adopted the Restatement test for reviewing liquidated damages clauses. The two-part Restatement test requires determining (1) whether the amount of liquidated damages was a "reasonable forecast" of actual damages and (2) whether actual damages were "incapable or very difficult of accurate estimation." RESTATEMENT OF CONTRACTS § 339 (1932). Applying the Restatement test, the district court held that the clause was enforceable.

¶ 10 On the first part of the Restatement test, the district court noted that its "deciding factor" was that "the amount of damages varied depending on the length of time the building was unoccupied." Because the lease "specified damages proportional to the length of the breach," the district court reasoned, it could not "find that Comcast has met its burden of establishing that the liquidated damages were not a reasonable forecast of actual damages."

¶ 11 On the second part, the district court noted that "the parties have offered [it] little guidance on this issue." The court determined that "the issue of unconscionability bears relevance" to this evaluation. As the court found none of the hallmarks of unconscionability to be present, it declined to "reallocate the assumption of the risk that was bargained for between the parties." The

court concluded that "Comcast cannot establish that either element of [the Restatement test] is not met, nor can Comcast prove that the agreement is unconscionable," and thus granted CRE's motion for partial summary judgment.

¶ 12 The district court also rejected Comcast's argument that CRE had failed to mitigate its damages. The district court first noted that it was "undisputed that CRE did nothing to assist in finding a new tenant other than refer inquiries to Comcast's agent." The court then refused to "speculate as to what CRE could have or should have done to secure another tenant or whether any other tenant would satisfy the requirement of occupancy."

¶ 13 Comcast timely appealed the district court's order. We have jurisdiction under section 78A–3–102(3)(j) of the Utah Code.

## STANDARD OF REVIEW

¶ 14 Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." UTAH R. CIV. P. 56(c). "We review the district court's decision to grant summary judgment for correctness, granting no deference to the district court." *Alliant Techsystems, Inc. v. Salt Lake Cnty. Bd. of Equalization*, 2012 UT 4, ¶ 17, 270 P.3d 441 (alteration omitted) (internal quotation marks omitted). "We may affirm a district court's entry of summary judgment if it is sustainable on any legal ground or theory apparent on the record." *Haik v. Sandy City*, 2011 UT 26, ¶ 10, 254 P.3d 171 (internal quotation marks omitted).

## ANALYSIS

¶ 15 Comcast challenges two aspects of the district court's grant of partial summary judgment in favor of CRE. First, Comcast argues that the district court erred in evaluating the enforceability of the liquidated damages provision. Second, Comcast contends that the district court erred in not considering CRE's alleged failure to mitigate its damages stemming from Comcast's

breach. We consider each of these arguments in turn.

## I. ENFORCEABILITY OF LIQUIDATED DAMAGES PROVISION

¶ 16 On appeal, the parties disagree as to which case law the district court should have applied to determine the validity of the liquidated damages clause. Comcast challenges the district court's decision in three respects: (1) the clause is a penalty on its face and therefore unenforceable, (2) the district court misapplied the Restatement test, and (3) this court should adopt the test laid out in section 356 of the Restatement (Second) of Contracts.

¶ 17 In response, CRE raises three primary arguments in support of the district court's decision: (1) Comcast did not satisfy its burden of proof to overcome the presumption that the clause was enforceable; (2) the district court correctly applied the Restatement test; and (3) Utah law is unclear regarding the appropriate test for liquidated damages, and this court should clarify that liquidated damages should be evaluated only for unconscionability. We agree with CRE's third point.

¶ 18 The parties have highlighted a sharp divide in how Utah courts have approached review of liquidated damages clauses. This problem is not unique to Utah. As early as 1854, the New York Court of Appeals observed the following:

> The ablest judges have declared that they felt themselves embarrassed in ascertaining the principle on which the decisions upon [the enforceability of liquidated damages clauses] were founded. They have said that the law relative to liquidated damages has always been in a state of great uncertainty; and that this has been occasioned by judges endeavoring to make better contracts for parties than they have made for themselves.

*Cotheal v. Talmage,* 9 N.Y. 551, 553–54 (1854) (citation omitted). The Supreme Court of Illinois similarly stated that "no branch of the law is involved in more obscurity by contradictory decisions than whether a sum specified in an agreement to secure performance will be treated as liquidated damages or a penalty." *Giesecke v. Cullerton,* 280 Ill. 510, 117 N.E. 777, 778 (1917); *see also McIntosh v. Johnson,* 8 Utah 359, 31 P. 450, 452 (Utah Terr.1892) (noting "a great conflict and confusion in the authorities in cases like this"); *Evans v. Moseley,* 84 Kan. 322, 114 P. 374, 375 (1911) ("There is no branch of the law on which a unanimity of decision is more difficult to find, or on which more illogical and inconsistent holdings may be found."). A century of legal scholarship reflects the same confusion over how courts should approach liquidated damages clauses. *See, e.g.,* Alvin C. Brightman, *Liquidated Damages,* 25 COLUM. L. REV. 277, 277 (1925); Larry A. DiMatteo, *A Theory of Efficient Penalty: Eliminating the Law of Liquidated Damages,* 38 AM. BUS. L.J. 633, 634–35 (2001); William H. Loyd, *Penalties and Forfeitures,* 29 HARV. L. REV. 117, 123 (1915).

¶ 19 Against this backdrop, we first survey our precedents regarding the enforceability of liquidated damages clauses.

### A. Liquidated Damages Clauses Have Been Subject to Varying Standards of Review

¶ 20 The parties have correctly identified that our case law reflects several competing approaches to evaluating the enforceability of liquidated damages clauses. The tension is apparent in one of the earliest cases considering the enforceability of such clauses. In *Dopp v. Richards,* this court upheld the enforceability of a stipulated forfeiture in the event of breach. 43 Utah 332, 135 P. 98, 100–01 (1913). The court first looked to whether the damages constituted an unenforceable penalty, which occurs when the damages could "readily and accurately be ascertained" at the time of contract formation. *Id.* at 101. By contrast, the court noted that such provisions likely would be enforceable "[w]here the damages are uncertain in their nature, difficult to ascertain or impossible to be estimated with certainty, ... and where the parties themselves are ... better able to compute the actual or probable damages." *Id.* (internal quotation

marks omitted). The court then attached a caveat to its reasoning:

> Those statements must, however, be applied subject to the principle of law that, unless the stipulations of a contract are oppressive, unconscionable, or against public policy, the courts ordinarily will not invade the province of the parties, but will, within well-recognized limits, permit them to determine for themselves what the consequences of a breach of their contracts shall be.

*Id.*

¶ 21 Thus, even one of our earliest cases [1] reflects some tension in how to review the enforceability of liquidated damages clauses: on one hand reviewing what can "readily and accurately be ascertained," but on the other deferring to contracting parties absent unconscionability. Our precedents reflect conflicting approaches to evaluating the enforceability of liquidated damages provisions, each of which we discuss in turn.

### 1. Disfavoring Penalties

¶ 22 One line of reasoning focuses on whether a contractual provision providing for liquidated damages constitutes a penalty. "It is an elementary principle of law that a provision in a contract between private individuals for a penalty in case of breach of such contract is void." *Croft v. Jensen,* 86 Utah 13, 40 P.2d 198, 202 (1935). "Whether the provision in the contract is to be construed as an agreement for liquidated damages or for a penalty must be determined by a consideration of the circumstances surrounding the parties at the time of its execution." *Id.* When parties specify liquidated damages in "contracts for the payment of money only," the damages generally are treated as a penalty. *Id.* (internal quotation marks omitted). "The general rule is that, where an agreement imposes several distinct duties or obligations of different degrees of importance, and the same sum is named as damages for the breach of either indifferently, the sum is to be regarded as a penalty." *W. Macaroni Mfg. Co. v. Fiore,* 47 Utah 108, 151 P. 984, 985–86 (1915). We further noted that if "whether a contract provides a penalty or liquidated damages is in doubt, the contract ordinarily will be regarded as providing a penalty" and thus unenforceable. *Id.* at 986.

¶ 23 Some of these cases note the tension between strictly reviewing a liquidated damages clause to determine whether it constitutes a penalty, and other approaches employed by this court over the years. *See, e.g., id.* (Frick, J., concurring) ("While, in the absence of fraud or oppression, it is not the province nor the policy of the courts to interfere with competent persons to enter into proper contracts, but to permit them to determine for themselves what the consequences of any breach thereof shall be, yet, in the interest of justice and fairness, the courts have formulated and adopted certain rules by which it is made possible and in most cases practicable, where a specific sum is provided for in case of breach, to determine whether the sum named shall be treated as a penalty or as liquidated damages." (citation omitted)). Furthermore, this line of cases has occasionally treated this approach as essentially another means of evaluating whether a liquidated damages clause is unconscionable. *See, e.g., Croft,* 40 P.2d at 202 ("To permit plaintiff to retain ... liquidated damages [in this case] ... is not in accord with equity and good conscience, but is clearly unconscionable.").

### 2. The Shock the Conscience Test

¶ 24 Another line of cases compares the amount of liquidated versus actual damages.

---

**1.** There are three liquidated damages cases that predate *Dopp.* In the first case, the Supreme Court of the Territory of Utah noted that "[t]here is a great conflict and confusion in the authorities in [liquidated damages] cases." *McIntosh,* 31 P. at 452. The court then stated the rule to be as follows:

> When the damages are of that nature that they cannot be reasonably ascertained by evidence, the amount named in the bond shall be taken as the true measure of damages; but where the

actual damages can be reasonably arrived at by evidence, the plaintiff, for the breach of the condition of the bond, can recover only the damages actually suffered.

*Id.* at 453. In the other two cases, the actual damages exceeded the liquidated damages and thus the court did not consider limits on enforcing liquidated damages clauses. *See Donovan v. Hanauer,* 32 Utah 317, 90 P. 569, 572–73 (1907); *K.P. Mining Co. v. Jacobson,* 30 Utah 115, 83 P. 728, 729 (1906).

The key inquiry concerns whether "the amount of liquidated damages bears no reasonable relationship to the actual damage or is so *grossly excessive* as to be entirely disproportionate to any possible loss that might have been contemplated that it *shocks the conscience*." *Warner v. Rasmussen*, 704 P.2d 559, 561 (Utah 1985) (emphases added) (footnote omitted). In reviewing the enforceability of a liquidated damages clause, this court has repeatedly noted that courts should focus on what the contracting parties knew at the time of contracting. *See, e.g., Dopp*, 135 P. at 101–02. In practice, however, the court seems to have engaged frequently in post hoc weighing. *See, e.g., Bellon v. Malnar*, 808 P.2d 1089, 1096–97 (Utah 1991) (looking to see whether "the amount of [liquidated damages] does not greatly exceed, or is less than, the amount of [actual] damages," then striking down liquidated damages "of over $26,000 in excess of actual damages" as "an unconscionable recovery"); *Soffe v. Ridd*, 659 P.2d 1082, 1084 (Utah 1983) ("In the present case actual damage and liquidated damage amounts are very disproportionate. Liquidated damages of $20,725 do not bear a reasonable relationship to $5,895 actual damages."); *Johnson v. Carman*, 572 P.2d 371, 373 (Utah 1977) ("Although we do not purport to lay down any specific percentage which will be considered unconscionable, to allow the seller to retain the $34,596.10 paid by buyer when seller's actual damages amount to only $25,650.00 would be 'grossly excessive and disproportionate to any possible loss.' "); *Bramwell Inv. Co. v. Uggla*, 81 Utah 85, 16 P.2d 913, 916 (1932) (noting that liquidated damages clauses are, "as a general rule, enforceable, if the amount stipulated is not disproportionate to the damages actually sustained").

¶ 25 Significantly, almost all of the cases applying "shock the conscience" analysis note that such amounts are unconscionable, although they appear to be using that term to refer only to *substantive* unconscionability. *See, e.g., Young Elec. Sign Co. v. Vetas*, 564 P.2d 758, 760 (Utah 1977). Indeed, some cases characterize the "shock the conscience" inquiry as simply equivalent to unconscionability analysis. *See, e.g., Jacobson v. Swan*, 3 Utah 2d 59, 278 P.2d 294, 298–99 (1954)

(noting that "relief can be granted only where the facts clearly demonstrate that to enforce [a liquidated damages clause] would be unconscionable"). And conversely, our court has used the "shock the conscience" language in describing the unconscionability inquiry. *See, e.g., Woodhaven Apartments v. Washington*, 942 P.2d 918, 925 (Utah 1997) (noting that the court must find the disparity between liquidated and actual damages "shock[s] the conscience or produce[s] a profound sense of injustice before there can be a determination of unconscionability"). To complicate matters, some cases characterize the "shock the conscience" analysis as another way of identifying when a liquidated damages clause is a penalty. *See, e.g., Jacobson*, 278 P.2d at 298.

### 3. The Restatement of Contracts Test

¶ 26 The first Restatement of Contracts lays out the following test for evaluating liquidated damages clauses:

> An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless
>
> (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and
>
> (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.

RESTATEMENT OF CONTRACTS § 339(1) (1932). These two factors are evaluated as of the time of contract formation, not breach. *See, e.g., Reliance Ins. Co. v. Utah Dep't of Transp.*, 858 P.2d 1363, 1367, 1369 (Utah 1993). *But see* RESTATEMENT OF CONTRACTS § 339 cmt. e (noting that a liquidated damages clause is not enforceable if the breach "causes no harm at all," even if the parties believed at the time of contract formation that the harm was "incapable or very difficult of accurate estimation").

¶ 27 The three most recent Utah Supreme Court cases to consider liquidated damages have all done so pursuant to section 339 of the first Restatement of Contracts. *See Reliance Ins.*, 858 P.2d at 1366–67 ("In determining the validity of a liquidated damages

provision, this court has adopted section 339 of the Restatement of Contracts." (citing *Robbins v. Finlay*, 645 P.2d 623, 626 (Utah 1982); *Perkins v. Spencer*, 121 Utah 468, 243 P.2d 446, 450–51 (1952))); *see also Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 24, 20 P.3d 388 (quoting the test as stated in *Reliance Insurance*); *Woodhaven Apartments*, 942 P.2d at 921 (same). In *Reliance Insurance*, the court cited to two cases, *Robbins* and *Perkins*, in support of its statement that section 339 had already been adopted. In *Robbins*, however, this court merely asserted that the court had relied on section 339 in *Johnson* and *Perkins*. *See* 645 P.2d at 626 (citing *Johnson*, 572 P.2d 371; *Perkins*, 243 P.2d 446). Neither *Johnson* nor *Perkins*, however, supports the proposition that this court had officially *adopted* the Restatement's test.

¶ 28 Neither *Johnson* nor *Perkins* actually relied on section 339. Instead, each case conducted a separate analysis and then noted that section 339 was "in accord" with existing Utah precedent. *Johnson*, 572 P.2d at 373; *Perkins*, 243 P.2d at 450. In fact, before *Reliance Insurance*, no Utah case had analyzed a liquidated damages clause by employing section 339's two-part approach. Out of more than thirty-five liquidated damages cases reaching the Utah Supreme Court, only the six referenced above have even cited the first Restatement of Contracts.[2]

4. Deference to Contracting Parties

¶ 29 Another line of cases defers to parties' freedom to contract where the parties have fairly bargained for liquidated damages. Cases in this line usually start with the long-standing principle of contract law that "courts ordinarily will not invade the province of the parties . . . to determine for themselves what the consequences of a breach of their contracts shall be." *Dopp*, 135 P. at 101. This court has stated that "[p]eople should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain," and that parties "should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side." *Carlson v. Hamilton*, 8 Utah 2d 272, 332 P.2d 989, 990–91 (1958); *accord Park Valley Corp. v. Bagley*, 635 P.2d 65, 67 (Utah 1981).

¶ 30 Cases employing this approach emphasize the role of general contractual remedies (such as mistake, fraud, duress, or unconscionability) as the checks on liquidated damages provisions.

> In the absence of fraud or imposition, the parties are bound by the price or measure of value they have agreed on, and such price must be paid notwithstanding it may be excessive. The courts cannot supervise decisions made in the business world and grant relief when the bargain proves improvident.

*Cole v. Parker*, 5 Utah 2d 263, 300 P.2d 623, 626 (1956). We have similarly emphasized the "right of persons to contract freely and to make real and genuine mistakes when their dealings are at arms' length." *Park Valley*, 635 P.2d at 67. And we have noted that "to be enforceable, a liquidated damages provision must not be a product of unfairness resulting from disparate bargaining positions, a lack of access to pertinent information, or anomalies in the bargaining process, such as those posed by monopolies, duress, or contracts of adhesion." *Robbins*, 645 P.2d at 626 (footnote omitted).

¶ 31 Cases employing this approach have at times emphasized unconscionability as the primary check on liquidated damages provisions. *See, e.g., Themy v. Seagull Enters., Inc.*, 595 P.2d 526, 529 (Utah 1979) (noting that liquidated damages clauses are enforceable "unless amounts retained as liquidated damages are so great as to be unconscionable, or in the nature of a penalty"); *Biesinger v. Behunin*, 584 P.2d 801, 803 (Utah 1978).

---

2. Nor has this court officially endorsed section 356 of the Restatement (Second) of Contracts. We have cited section 356 only on two occasions. The first citation, appearing in a concurring opinion, supported only the "principal reason for the validity of provisions for liquidated damages" in general. *Soffe*, 659 P.2d at 1086 (Oaks, J., concurring). The second citation noted only that section 356 is in accord with several prior Utah cases on liquidated damages. *Madsen v. Anderson*, 667 P.2d 44, 47 (Utah 1983).

In *Carlson v. Hamilton,* the court made this point with particular force:

> It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.

332 P.2d at 991. In fact, the court noted that the "spirit" of *Perkins* "calls for adhesion to a principle that equity historically has indulged[ ]—that it abhors unconscionability shocking to such degree that the function of equity would be misconceived and misapplied by the enforcement of such unconscionability, even though it may have been the subject of contract." *Id.* at 990. In contrasting the facts in *Carlson* with those in *Perkins,* the court noted that "[t]he two cases are poles apart, the one obviously being punctuated by unconscionability, the other appearing to call only for" a reasonable amount of damages. *Id.* Certain language in *Perkins* supports such a characterization. *See* 243 P.2d at 451 ("It is true that [nullifying a liquidated damages provision] should be done only with great reluctance and when the facts clearly demonstrate that it would be unconscionable to decree enforcement of the terms of the contract. This is such a case.").

¶ 32 This court has on several occasions explicitly noted the tension between focusing on the right to contract and subjecting liquidated damages clauses to stricter scrutiny. *See, e.g., Andreasen v. Hansen,* 8 Utah 2d 370, 335 P.2d 404, 407 (1959) (laying out the "shock the conscience" rule, then noting in the next sentence that "it is to be kept firmly in mind, that the courts recognize the rights of parties freely to contract and are extremely reluctant to do anything which will fail to give full recognition to such rights"); *see also Allen v. Kingdon,* 723 P.2d 394, 398 (Utah 1986) (Zimmerman, J., concurring) (noting the conflicting case law as to whether liquidated damages clauses are "carefully scrutinize[d]"). We have not yet provided a clear resolution to this inherent tension.

## B. Liquidated Damages Clauses Should Be Reviewed Like Other Contractual Provisions

¶ 33 The competing approaches outlined above have led to "obscurity by contradictory decisions," *Giesecke,* 117 N.E. at 778, and left "the law relative to liquidated damages ... in a state of great uncertainty," *Cotheal,* 9 N.Y. at 554. It is no wonder that the district court in this case had difficulty applying our conflicting case law to the dispute between Comcast and CRE. We now clarify the standard that Utah courts should use in evaluating the enforceability of liquidated damages provisions.

¶ 34 The direct determination whether a liquidated damages clause appears to be a penalty imposes an unnecessary additional check on the enforceability of such clauses. First, it improperly reverses the general presumption that contractual provisions are enforceable. *See, e.g., W. Macaroni Mfg.,* 151 P. at 986. Second, the penalty inquiry is motivated by "the interest of justice and fairness," *id.* (Frick, J., concurring), which can be adequately protected through general contractual remedies. Prior cases' framing of the penalty inquiry as a search for unconscionability reinforces this point. *See, e.g., Croft,* 40 P.2d at 202 (concluding that a penalty would be "clearly unconscionable").

¶ 35 The "shock the conscience" standard similarly is problematic for a number of reasons. First, cases employing this approach have tended to evaluate the enforceability of liquidated damages clauses with the benefit of hindsight, rather than as of the time of contract formation. The opinions thus tend to contain conclusory statements that the court's conscience was shocked. *See, e.g., Johnson,* 572 P.2d at 373. Additionally, cases using this approach have frequently resulted in split opinions in which the majority and dissent sharply disagree regarding the post hoc weighing. *Compare, e.g., id.* ("Although we do not purport to lay down any specific percentage which will be considered unconscionable, to allow the seller to retain the $34,596.10 paid by buyer when seller's actual damages amount to only $25,650.00 would be grossly excessive and disproportionate to any possible loss." (inter-

nal quotation marks omitted)), *with id.* at 374 (Ellett, J., dissenting) ("[In *Carlson v. Hamilton,* the] court refused to allow recovery on the ground that a loss of [9.5 percent] was not enough to be shocking to the conscience. If [9.5 percent] is not shocking, how can [2.2 percent] be considered so?"). Finally, cases employing this approach have repeatedly conditioned enforceability on the court's conclusion that a given liquidated damages clause is not unconscionable. *See, e.g., Jacobson,* 278 P.2d at 299 (noting that, in applying the shock the conscience test, "relief can be granted only where the facts clearly demonstrate that to enforce [a liquidated damages clause] would be unconscionable"). Thus application of general contractual analysis, including the doctrine of unconscionability, would adequately safeguard the interests sought to be protected through the shock the conscience approach. *Cf. Woodhaven Apartments,* 942 P.2d at 925 (noting that the court must find the disparity between liquidated and actual damages "shock[s] the conscience or produce[s] a profound sense of injustice before there can be a determination of unconscionability").

¶ 36 The Restatement test raises similar concerns. First, as noted above, this court has only recently applied the Restatement test directly—and only after mistakenly concluding that this court had already adopted the test. *See supra* ¶¶ 26–28. Second, as the district court noted in this case, the Restatement test "presents somewhat of a Hobson's choice," a point illustrated by other jurisdictions' struggles in applying this approach. *See, e.g., Arrowhead Sch. Dist. No. 75, Park Cnty. v. Klyap,* 318 Mont. 103, 79 P.3d 250, 258 (2003) (noting that the two-pronged approach can be "circular and subjective"). The first part of the Restatement test requires a "reasonable forecast" of actual damages, yet the second part requires actual damages to be "incapable or very difficult of accurate estimation." Restatement of Contracts § 339. It is hard to comprehend how courts can evaluate the reasonableness of a forecast made when actual damages are nearly impossible to estimate at the time of contract formation. As the comments to the Restatement note, enforcement of liquidated damages clauses is intended to "save[ ]

the time of courts, juries, parties, and witnesses and reduce[ ] the expense of litigation." *Id.* § 339 cmt. c. The Restatement test, however, actually *encourages* litigation regarding the reasonableness of the forecast and the difficulty of estimating the harm.

¶ 37 Finally, this court has found unconscionability in almost every case in which we have declined to enforce a liquidated damages clause. *See Bellon,* 808 P.2d at 1097. *But see Woodhaven Apartments,* 942 P.2d at 925 ("[O]ur determination that the contract provision is unenforceable does not necessarily mean that such provision was unconscionable. There must be sufficient evidence to find unconscionability and in this case such is lacking."). Indeed, cases applying one of the other three approaches to evaluating liquidated damages clauses note that the court's underlying goal is to avoid enforcement of *unconscionable* liquidated damages clauses. *See, e.g., Croft,* 40 P.2d at 202; *Jacobson,* 278 P.2d at 299; *Woodhaven Apartments,* 942 P.2d at 920–21 (applying Restatement test after first noting that the court has " 'uniformly held [a liquidated damages clause] to be unenforceable' " where " 'enforcement of the [clause] would allow an unconscionable and exorbitant recovery' " (quoting *Perkins,* 243 P.2d at 449–50)); *see also Perkins,* 243 P.2d at 453 (Wolfe, C.J., concurring) (noting that section 339 "works out in requiring ... that the amount demanded as liquidated damages be conscionable").

¶ 38 We now hold that liquidated damages clauses should be reviewed in the same manner as other contractual provisions. "Persons dealing at arm's length are entitled to contract on their own terms without the intervention of the courts for the purpose of relieving one side or the other from the effects of a bad bargain." *Biesinger,* 584 P.2d at 803. "It is not our prerogative to step in and renegotiate the contract of the parties." *Peck v. Judd,* 7 Utah 2d 420, 326 P.2d 712, 717 (1958). Instead, unless enforcement of a liquidated damages clause would be unconscionable, "we should recognize and honor the right of persons to contract freely and to make real and genuine mistakes when the dealings are at arms' length." *Id.* "Courts ... should not interfere

except when sharp practice or most unconscionable result[s] are to be prevented." *Id.* Courts should invalidate liquidated damages clauses "only with great reluctance and when the facts clearly demonstrate that it would be unconscionable to decree enforcement of the terms of the contract." *Perkins,* 243 P.2d at 451.

¶ 39 Comcast argues that, by reviewing liquidated damages clauses only for unconscionability, this court would allow parties to "effectively stipulate to permit punitive damages in the event of breach." We disagree. Reviewing liquidated damages clauses for unconscionability still preserves challenges to penalty clauses. Even our cases purporting to apply the penalty approach conclude that penalties are unenforceable because they are unconscionable. *See, e.g., Croft,* 40 P.2d at 202. Furthermore, our case law employing the penalty approach looks at "the circumstances surrounding the parties at the time of [the contract's] execution," *id.*—the same inquiry we engage in for claims of unconscionability.

¶ 40 Thus we clarify that liquidated damages clauses are not subject to any form of heightened judicial scrutiny. Instead, courts should begin with the longstanding presumption that liquidated damages clauses are enforceable. *See, e.g., Bair,* 2001 UT 20, ¶ 25, 20 P.3d 388. A party may challenge the enforceability of a liquidated damages clause only by pursuing one of the general contractual remedies, such as mistake, fraud, duress, or unconscionability. *See, e.g., Buckner v. Kennard,* 2004 UT 78, ¶ 57, 99 P.3d 842; *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028, 1043 (Utah 1985).

### C. The Liquidated Damages Clause in This Case Is Enforceable

¶ 41 Comcast challenges the enforceability of the liquidated damages clause in its contract with CRE. The burden lies with Comcast in challenging the enforceability of the clause. *See Ryan v. Dan's Food Stores, Inc.,* 972 P.2d 395, 402 (Utah 1998) ("A party claiming unconscionability bears a heavy burden."); *Res. Mgmt. Co.,* 706 P.2d at 1043 (noting, after first laying out the standards for evaluating unconscionability, that

"a duly executed written contract should be overturned only by clear and convincing evidence"); *see also, e.g., Bair,* 2001 UT 20, ¶ 25, 20 P.3d 388 (noting the burden is on the party seeking to invalidate a liquidated damages clause). As we have previously noted, the burden properly rests on the party challenging the clause's enforceability because "the purpose of a liquidated damages provision is to obviate the need for the nonbreaching party to prove actual damages." *Bair,* 2001 UT 20, ¶ 25, 20 P.3d 388.

¶ 42 "In determining whether a contract is unconscionable, we use a two-pronged analysis." *Ryan,* 972 P.2d at 402. "The first prong—substantive unconscionability—focuses on the agreement's contents. The second prong—procedural unconscionability—focuses on the formation of the agreement." *Id.* But "substantive unconscionability alone may support a finding of unconscionability." *Id.*

¶ 43 "Procedural unconscionability focuses on the negotiation of the contract and the circumstances of the parties." *Id.* at 403. The key inquiry is "whether there was overreaching by a contracting party occupying an unfairly superior bargaining position." *Id.* We have laid out six factors bearing on procedural unconscionability. *Id.* In this case, however, Comcast does not allege procedural unconscionability. Nor could it, as Comcast (through its predecessor) drafted the contract in its entirety, including the liquidated damages clause, and presented the contract to CRE for its approval. Thus *none* of the hallmarks of procedural unconscionability are present in this case.

¶ 44 "Substantive unconscionability focuses on the contents of an agreement, examining the relative fairness of the obligations assumed." *Id.* at 402 (internal quotation marks omitted). It is not sufficient for the liquidated damages clause to be "unreasonable or more advantageous to one party." *Id.* Instead, "we consider whether a contract's terms are so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an overall imbalance in the obligations and rights imposed by the bargain according to the mores and business

practices of the time and place." *Id.* (alteration omitted) (internal quotation marks omitted).

 ¶ 45 There are no signs of substantive unconscionability with respect to the liquidated damages clause in this contract. Although the clause may be "more advantageous" to CRE, it is not "so one-sided as to oppress" Comcast—particularly where Comcast stands in the shoes of the party that drafted the clause in the first instance. Nor do we find the contractual amount of liquidated damages unreasonable as compensation for a breach of the contractual duty to continuously operate the building. Although Comcast now argues that over $1.7 million in liquidated damages is "grossly disproportionate" to CRE's actual damages, this type of post hoc weighing does not bear on the question of substantive unconscionability, which focuses on the "relative fairness of the obligations assumed" at the time of contracting. "All that appears is that [Comcast] over-obligated [itself] and perhaps made an improvident bargain, but the courts cannot supervise decisions made in the business world and provide relief in this instance." *Park Valley*, 635 P.2d at 68.

## II. DUTY TO MITIGATE DAMAGES

¶ 46 Comcast also argues that CRE failed to mitigate its damages stemming from Comcast's failure to continuously operate the building. Comcast raises two arguments on this issue: (1) the district court erroneously considered Comcast to be a unique tenant under the contract and (2) CRE's efforts (if any) to mitigate were insufficient to satisfy its duty to mitigate damages. CRE counters that its efforts were sufficient to satisfy its duty and that Comcast has failed to meet its burden to present evidence of what CRE could have done to further mitigate damages. We agree with CRE.

 ¶ 47 As previously noted, CRE had a contractual duty to "exercise its reasonable best efforts to mitigate its damages" from Comcast's breach. The general duty to miti-

gate requires a landlord "to take such steps as would be expected of a reasonable landlord letting out a similar property in the same market conditions." *Reid v. Mut. of Omaha Ins. Co.*, 776 P.2d 896, 907 (Utah 1989). We have noted that "the objective commercial reasonableness of mitigation efforts is a fact question that depends heavily on the particularities of the property and the relevant market at the pertinent point in time." *Id.*

 ¶ 48 Significantly, however, "the burden of proving plaintiff has not mitigated its damages and that its award should be correspondingly reduced is on defendant." *John Call Eng'g, Inc. v. Manti City Corp.*, 795 P.2d 678, 680 (Utah Ct.App.1990). In order to survive summary judgment, Comcast therefore needed to offer some evidence that "would have allowed the court to submit the issue to the jury." *Id.* at 680–81. Instead, Comcast has done nothing but repeatedly assert in briefing and oral argument that CRE "clearly could have done more" to mitigate its damages. It is undisputed, however, that "CRE referred any inquiries regarding the property to Comcast's real estate agent." We thus disagree with Comcast's assertion that "the record plainly indicates that CRE did nothing more than sit on its hands and allow liquidated damages to accrue."

¶ 49 Comcast offered no evidence to the district court as to how CRE could have further mitigated its damages. Comcast thus failed to carry its burden. We therefore affirm the district court's conclusion that CRE did not breach its duty to mitigate.[3]

## CONCLUSION

¶ 50 Liquidated damages clauses are not subject to heightened judicial scrutiny. Instead, such clauses are presumed enforceable, although they may be challenged on the same equitable grounds as other contractual provisions. We conclude that no such

---

**3.** We agree with Comcast that the district court erred in treating Comcast as a unique, irreplaceable tenant. The district court stated that "the contract specified particularly that [Comcast] was to occupy the building." The contract does not so designate Comcast as a unique or irreplaceable tenant. In light of Comcast's failure to satisfy its burden, however, we nonetheless affirm the district court's decision on this point, albeit on alternate grounds.

grounds exist to invalidate the liquidated damages clause in the contract between Comcast and CRE. We further hold that Comcast did not carry its burden with respect to challenging CRE's alleged failure to mitigate its damages. We therefore affirm the district court's grant of partial summary judgment in CRE's favor and remand for further proceedings consistent with this opinion.

Justice DURHAM authored the opinion of the Court, in which Associate Chief Justice NEHRING and Justice PARRISH joined.

Having recused himself, Chief Justice DURRANT did not participate herein. District Judge FRATTO sat, but retired shortly after.

Justice LEE, concurring in part and concurring in the judgment:

¶ 51 I concur in the court's decision upholding the enforceability of the liquidated damages clause at issue in this case, but write separately because I disagree with its basis for doing so. The court today makes a useful clarification of the legal standard that applies in evaluating the enforceability of liquidated damages provisions. But in my view it errs in going further—in repudiating the standard for assessing liquidated damages clauses set forth in the Restatement (First) of Contracts and repeatedly endorsed by this court.[1] I would affirm that standard (after clarifying it in the way the court does) instead of repudiating it in favor of an ill-defined inquiry into unconscionability.

¶ 52 On an important threshold point, I agree with the court's conclusion that our liquidated damages cases stand in need of clarification. *Supra* ¶ 20. As the court has ably explained, our liquidated damages precedents have employed a range of different standards. Prior to our adoption of the Restatement test in 1993, our cases seemed to be in conflict and no standard was uniformly employed. *Supra* ¶¶ 20–33. We resolved much of the conflict in adopting the Restatement test, however. The problem that remained in our prior case law is one the court corrects today—the tendency to "evaluate the enforceability of liquidated damages clauses with the benefit of hindsight, rather than as of the time of contract formation." *Supra* ¶ 36. As the court notes, such post-hoc review is problematic for various reasons, *supra* ¶ 36, not the least of which is its potential to inject arbitrariness and unpredictability into a field in which contracting parties need a sound basis for reliance.

¶ 53 I am accordingly in full agreement with a threshold course-correction charted by the majority—its repudiation of the hindsight-based approach followed in some of our cases and clarification that the reasonableness evaluation must be made from the standpoint of the parties at the time they entered into the contract. But I see no reason to take the additional step of abandoning the timeworn Restatement test in its entirety. That test, informed by a wealth of precedent in this state and the many others that have embraced it, provides needed predictability for contracting parties seeking to anticipate the likely enforceability of the terms of their agreement. We should reaffirm that standard (after clarifying it), as there is no good reason to abandon it.

¶ 54 The imprecisions in our liquidated damages cases are hardly grounds for discarding the Restatement test. The problem is not the Restatement test; it is the notion of post-hoc evaluation of reasonableness. But that approach pre-dates this court's express adoption of the Restatement test in

---

1. This court first recognized the Restatement approach in *Perkins v. Spencer*, where we characterized it as in accord with our existing case law. 121 Utah 468, 243 P.2d 446, 450–51 (1952). Even then, however, a standard similar to the Restatement had already been in use for decades in Utah. *See McIntosh v. Johnson*, 8 Utah 359, 31 P. 450, 453 (Utah Terr.1892) ("When the damages are of that nature that they cannot be reasonably ascertained by evidence, the amount named in the bond shall be taken as the true measure of damages[.]"); *Dopp v. Richards*, 43 Utah 332, 135 P. 98, 101 (1913) (indicating that enforceability of liquidation clauses depends on whether damages could "readily and accurately be ascertained" at the time of contract formation or whether "damages are uncertain in their nature" such that "the parties themselves are ... better able to compute the actual or probable damages").

1993,[2] and the cases decided since then are uniformly consistent. Though few in number, each has relied on the Restatement test. And none has fallen into the error of hindsight-based evaluation of reasonableness.[3] The problem seems comfortably behind us.

¶ 55 Even before we embraced the Restatement standard in 1993, many of our cases still endorsed a "reasonable forecast" or similar test. Although those cases proceeded to engage in improper post-hoc weighing, some nonetheless appeared to start with the right premise—that the question is whether liquidated damages are "disproportionate to any possible loss *that might have been contemplated.*"[4] These cases, therefore, do not demonstrate our court's preference for a different standard so much as they show a failure to apply accepted principles correctly.[5] The proper reaction, then, is not to throw out the cases in their entirety, but to correct the error in application. The court has now done that, and we need not go further.

¶ 56 The supposed internal inconsistency in the Restatement standard, see *supra* ¶ 37, is also no reason to abandon it. The criticism put forward by the court on this score rests on a misunderstanding of the law. Properly understood, there is no incompatibility between the two prongs of the Restatement inquiry.

¶ 57 The reasonable forecast inquiry is the core standard under the Restatement; the difficulty of estimation element is subsidiary and explanatory. Nothing about that latter element in any way renders the core legal inquiry "'circular.'" *Supra* ¶ 37 (quoting *Arrowhead Sch. Dist. No. 75, Park Cnty. v. Klyap*, 318 Mont. 103, 79 P.3d 250, 258 (2003)). Courts and commentators have long resolved any apparent difficulty in comprehending "how courts can evaluate the reasonableness of a forecast made when actual damages are nearly impossible to estimate at the time of contract formation," *supra* ¶ 37: When damages are difficult to estimate at the time of contract formation, a liquidated sum is more likely to be deemed reasonable (and vice-versa).[6] That's the whole point of the Restatement's two-part inquiry; it's a sliding scale, with the degree of deference to the damages liquidated by contract depending on the degree of difficulty of estimating damages in advance. Thus, the Restatement test presents not a "'Hobson's choice,'" *supra* ¶ 37, but a helpful clarification of the standard that has long governed the enforceability of liquidated damages clauses in Utah and elsewhere.

---

2. See *Reliance Ins. Co. v. Utah Dep't of Transp.*, 858 P.2d 1363, 1366–67 (Utah 1993). The court denigrates the *Reliance* court's notion of "adoption" on the ground that the prior cases cited in *Reliance* did not themselves expressly adopt the Restatement. *See supra* ¶¶ 28–29. Whatever the state of the law prior to *Reliance*, however, it seems clear that the court recognized the adoption of the Restatement test in *Reliance* and has been employing it ever since.

3. See *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 24, 20 P.3d 388; *Woodhaven Apartments v. Washington*, 942 P.2d 918, 920–23 (Utah 1997); *Reliance*, 858 P.2d at 1367, 1369.

4. *Warner v. Rasmussen*, 704 P.2d 559, 563 (Utah 1985) (emphasis added).

5. See *id.* (applying the "reasonable forecast" standard by evaluating the forfeiture based on its "comparison to the actual damages"); *Jacobson v. Swan*, 3 Utah 2d 59, 278 P.2d 294, 298–99 (1954) (same); *supra* ¶¶ 24–25.

6. *MetLife Capital Fin. Corp. v. Washington Ave. Assocs.*, 159 N.J. 484, 732 A.2d 493, 498 (1999) ("Courts began to treat the two-pronged [Restatement] test as a continuum; the more uncertain the damages caused by a breach, the more latitude courts gave the parties on their estimate of damages."); *see Moore v. St. Clair Cnty.*, 120 Mich.App. 335, 328 N.W.2d 47, 50 (1982) ("And in proportion as the difficulty of ascertaining the actual damage by proof is greater or less, where this difficulty grows out of the nature of such damages, in the like proportion is the presumption more or less strong that the parties intended to fix the amount." (internal quotation marks omitted) (quoting *Jaquith v. Hudson*, 5 Mich. 123, 138 (1858))); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. b (1981) ("If the difficulty of proof of loss is great, considerable latitude is allowed in the approximation of anticipated or actual harm."); *Luna v. Smith*, 861 S.W.2d 775, 779 (Mo.Ct.App.1993) (same); Charles J. Goetz & Robert E. Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach*, 77 COLUM. L. REV. 554, 559–60 (1977) ("[A]s the uncertainty facing the contracting parties increases, so does their latitude in stipulating post-breach damages.").

¶ 58 I would thus retain that standard and apply it in this case, as neither the parties nor the court have identified any persuasive reason to abandon it. And even if I were of a mind to jettison this test, I would not replace it with the undefined standard of "unconscionability" adopted by the court today. *Supra* ¶ 39. I am, of course, on board with the general principle of freedom of contract. It's hard to argue with the "right of persons to contract freely and to make real and genuine mistakes when the dealings are at arms' length," much less with the notion that it is not the prerogative of the courts " 'to step in and renegotiate the contract of the parties,' " *supra* ¶ 39 (quoting *Peck v. Judd*, 7 Utah 2d 420, 326 P.2d 712, 717 (1958)). But those general principles are subject to limited exceptions, which are necessary (as the majority itself acknowledges) to foreclose the availability of " 'punitive damages' " for breach of contract, *supra* ¶ 40, which would have the troubling effect of deterring efficient breach.[7] So the question before us is not whether to recognize a general rule favoring the freedom of contract; it is how to define the exception to the general rule in the liquidated damages context.

¶ 59 The majority replaces the settled standard adopted in our cases with an undefined "unconscionability" inquiry into whether "the facts clearly demonstrate that it would be unconscionable to decree enforcement of the terms of the contract." *Supra* ¶ 39. Without some elaboration by the court, that standard strikes me as an invitation for arbitrariness in future cases.

¶ 60 The substantive unconscionability inquiry invites an evaluation of the reasonableness of the substance of the bargain entered into by the parties.[8] If the reasonableness assessment is to be conducted from the standpoint of the parties at the time of formation—as the majority opinion demands, *supra* ¶ 46—then perhaps the analysis will look much like the Restatement "reasonable forecast" inquiry. If that is what the majority has in mind, then today's decision rejecting that standard is at best perplexing. And if the majority has something else in mind (as we must suppose from the court's express repudiation of the Restatement), then the matter is even worse.

¶ 61 The majority never explains how the substantive unconscionability or fairness of a liquidated damages clause is to be evaluated going forward. It offers only its bottom-line conclusion that "the contractual amount of liquidated damages" is not "unreasonable as compensation for a breach of the contractual duty to continuously operate the building." *Supra* ¶ 46. That fuzzy fairness analysis is an invitation for arbitrariness in judicial decisionmaking.[9] Contracting parties deserve more from the courts. They deserve a workable standard they can rely on and contract around.[10] I see the Restatement standard as

---

7. *Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63 (2d Cir.1985) ("[B]reaches of contract that are in fact efficient and wealth-enhancing should be encouraged.... The addition of punitive damages to traditional contract remedies would prevent many such beneficial actions from being taken."); *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445–46 (Del.1996) (stating that expectation damages increase economic efficiency by incentivizing breach only when the benefits from the breach sufficiently compensate both parties; "Punitive damages would increase the amount of damages in excess of the promisee's expectation interests and lead to inefficient results."); RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW, ch. 4 (4th ed. 1992).

8. *See Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998) ("In determining substantive unconscionability, we consider ... whether there exists an overall imbalance in the obligations and rights imposed by the bargain...." (internal quotation marks omitted)); *Sosa v. Paulos*, 924 P.2d 357, 361 (Utah 1996) (substantive unconscionability "focus[es] on the contents of the agreement, examining the relative fairness of the obligations assumed" (internal quotation marks omitted)).

9. *See* Evelyn L. Brown, *The Uncertainty of U.C.C. Section 2–302: Why Unconscionability Has Become a Relic*, 105 COM L.J. 287, 291 (2000) ("Common law definitions of unconscionability are ... so unclear and inconsistent that they provide little, if any, guidance as to what unconscionability really means.").

10. *See Morris v. Redwood Empire Bancorp*, 128 Cal.App.4th 1305, 27 Cal.Rptr.3d 797, 804 (2005) ("An undefined standard of what is 'unfair' fails to give businesses adequate guidelines as to what conduct may be challenged and thus enjoined and may sanction arbitrary or unpredictable decisions about what is fair or unfair." (internal quotation marks omitted)).

providing that predictability and workability. In rejecting it, the court revives the muddle it so helpfully resolved in the first part of its opinion. I therefore disagree with the adoption of an undefined unconscionability standard in a field where predictability and reliance are so crucial.

¶ 62 Under the Restatement standard that I would apply, the judgment entered by the majority would still obtain. As the party seeking to challenge the enforceability of the liquidated damages clause in this case, Comcast bore the burden of demonstrating that the damages liquidated by the parties in this case were a reasonable forecast of the damages they anticipated at the time of the execution of the contract.[11] And Comcast utterly failed to carry its burden and thus should lose on that basis. Specifically, because Comcast failed to present any evidence of the nature of the damages anticipated by the parties or of the relationship the liquidated damages bore to those damages, its challenge to the liquidated damages clause in this case fails as a matter of law. I would affirm on that basis instead of altering our standard in a way that seems sure to undermine predictability in contracts in Utah and to inject arbitrariness into the judicial evaluation of liquidated damages clauses.

---

11. *See Bair*, 2001 UT 20, ¶¶ 25–26, 20 P.3d 388 ("[T]he party attempting to *avoid* the liquidated damages provision . . . . has the burden of proving that the liquidated damages clause was not a reasonable forecast of actual damages."); *Young Elec. Sign Co. v. United Standard W., Inc.*, 755 P.2d 162, 164 (Utah 1988) (same).